739 F.2d 77
 Walter SHER, Plaintiff-Appellant,
v.
Thomas COUGHLIN, III, Individually and as Commissioner of
Correctional Services, Robert J. Henderson, Individually and
as Superintendent of Auburn Correctional Facility; Robert
Butera, Individually and as Senior Counselor at Auburn
Correctional Facility; Arthur Leonardo, Individually and as
Director of Transportation and Movement; Robert Nelepovitz,
Individually and as Deputy Superintendent of Security at
Auburn Correctional Facility, Defendants-Appellees.
 No. 765, Docket 83-2317.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1984.
Decided July 11, 1984.
 
 Faith Seidenberg, Syracuse, N.Y., for plaintiff-appellant.
 Martin A. Hotvet, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen., William J. Kogan, Asst. Sol. Gen., Albany, N.Y., on the brief), for defendants-appellees.
 Before TIMBERS, NEWMAN and PRATT, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 Walter Sher appeals from a judgment of the District Court for the Northern District of New York (Howard G. Munson, Chief Judge) dismissing, after a bench trial, his complaint challenging his transfer from the general population of the Auburn Correctional Facility to the Reclassification Unit of the Attica Correctional Facility. Sher brought suit for damages and other relief under 42 U.S.C. Sec. 1983 against the New York Commissioner of Correctional Services and several officers of the Auburn facility. We affirm.
 
 Facts
 
 2
 The record discloses the following facts underlying Sher's transfer from Auburn to Attica and his confinement there in the Reclassification Unit. An investigation into the expenditures of inmates' funds at Auburn uncovered a scheme to funnel funds illegally to Sher. About $2,000 worth of checks drawn by 23 inmates during a three-month period in 1980 payable to "Hanigan's Legal Services," purportedly for the acquisition of legal materials, were ultimately endorsed by Sher's wife. No legal materials were received by the inmates. The proceeds from the checks to "Hanigan's Legal Services" were delivered to Sher at Auburn by visitors. As a result of the investigation into the inmate scam, prison officials concluded that Sher's transfer to another prison would be in the best interests of both Sher and the correctional system.
 
 
 3
 Once transfer to Attica was decided, a further decision was made to assign Sher to the Reclassification Unit at Attica rather than to the general prison population. This unit is one type of Special Housing Unit, a category of cells used for confinement for a variety of administrative as well as disciplinary purposes. 7 N.Y.C.R.R. Secs. 300.2(b), 300.3(b) (1982). Sher maintains that the restrictive conditions of confinement imposed on reclassification inmates include: (1) denial of job assignments, vocational and educational programs, and library facilities, (2) confinement to cells for 22-23 hours per day, compared to 14-16 hours for general population inmates, and (3) limited visitation privileges. He contends that the conditions of confinement in the Reclassification Unit closely resemble those imposed on disciplined inmates.
 
 
 4
 The State contends that the main purpose of the Reclassification Unit is to benefit the inmate by identifying the lowest level of security required for his confinement. During the reclassification process, which lasts from three to eight weeks, restrictions are imposed upon the inmate allegedly to permit individualized evaluation of his behavior and attitude on which to base a reclassification decision. The corrections official in charge of classification, who ordered Sher's transfer to the Reclassification Unit at Attica, averred that confinement in the unit was ordered to evaluate Sher's adjustment to prison life, to uncover the source of his difficulties, and to determine an appropriate classification, facility, and program.
 
 
 5
 Sher contends that he was transferred to Attica and confined in the Reclassification Unit there as a disciplinary sanction for his role in the inmate scam, an activity in which he denies any involvement and for which no finding of wrongdoing on his part has been made. He further challenges the bona fides of the State's administrative reasons for the transfer and restrictive confinement by contending that an outstanding federal detainer and his designation as a central monitoring case precluded his reclassification to any status less than maximum security confinement. However, the prison officials deny that Sher was ineligible for reclassification, and, in fact he was recommended for transfer to a reduced security facility. That recommendation was not carried out because, during the pendency of this litigation, Chief Judge Munson ordered Sher returned to Auburn after he had spent seven weeks in Attica.[1]
 
 
 6
 Chief Judge Munson initially granted partial summary judgment for the defendants on Sher's primary claim that his transfer and restrictive confinement were imposed without procedural due process. On Sher's motion for reconsideration, however, the District Judge concluded that our recent decision in McCann v. Coughlin, 698 F.2d 112 (2d Cir.1983), "probably" applied to Sher's case. In McCann we ruled that a prisoner facing sanctions for "disciplinary violations," id. at 119, was entitled to procedural due process when the possible sanctions include "confinement in a Special Housing Unit" or confinement to his quarters or elsewhere for at least fourteen days." Id. at 121. Chief Judge Munson further ruled that Sher's transfer and confinement in the Reclassification Unit had been accomplished in violation of his right to procedural due process, but that, because of the unsettled state of the law, defendants had not deprived Sher of a clearly established right and were therefore entitled to judgment based on a qualified immunity defense of good faith. At a subsequent bench trial, the District Court rejected for lack of proof Sher's additional claims that the transfer had denied him access to counsel and that there existed an unofficial policy to pay prisoners their pre-transfer wages during the reclassification process.
 
 
 7
 On appeal, Sher contends that it was error to deny his claim for damages for the alleged denial of procedural due process in connection with his transfer and restrictive confinement and his claim for continuation of his pre-transfer wages.
 
 Discussion
 
 8
 The wage claim is without merit in view of the District Court's finding that Sher did not prove the existence of a policy to pay pre-transfer wages to inmates during reclassification. That finding is not clearly erroneous. The principal issue on appeal concerns the claim for damages for the allegedly unlawful transfer and restrictive confinement. We need not consider the correctness of the ruling concerning a defense of qualified immunity since we conclude that the transfer and restrictive confinement without procedural due process protection did not deny Sher any constitutional right.
 
 
 9
 Sher's transfer from Auburn to Attica was not constitutionally required to be preceded by due process procedures because neither the Fourteenth Amendment independently nor New York law accords an inmate a liberty interest in remaining at a particular prison facility. Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). The Supreme Court made clear in Haymes that a transfer between New York prisons does not deny a liberty interest no matter what "part an inmate's behavior may play in a decision to transfer." Id. at 243, 96 S.Ct. at 2547. Sher's contention that his transfer was not really ordered for the administrative purpose of assuring safety by separating him from victims of the scam but was punishment for his conduct therefore provides no basis for finding impairment of a liberty interest.
 
 
 10
 Whether Sher's placement in conditions of restrictive confinement after his arrival at Attica implicates any liberty interest requires further consideration. Though the Supreme Court has ruled that punitive motivation is irrelevant in determining whether a prison transfer in New York impairs a liberty interest, Montanye v. Haymes, supra; see Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (same result in Massachusetts), the Court has thus far not reached the same conclusion with respect to an inmate's placement in conditions of restrictive confinement within a prison. In ruling last year that such confinement does not impair a liberty interest protected solely by the Fourteenth Amendment, without regard to state law, the Court was careful to note that it was considering placement in restrictive confinement "for nonpunitive reasons." Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983). Yet there is reason to believe that the Court does not view the Fourteenth Amendment itself as a source of a liberty interest that protects an inmate from placement in more restrictive confinement. In Helms, the Court emphasized that its prior decision in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which had recognized a liberty interest in remaining free of restrictive confinement, was grounded on the substantive protection accorded by state law, not by the Fourteenth Amendment itself. 103 S.Ct. at 870. See also Meachum v. Fano, supra, 427 U.S. at 226, 96 S.Ct. at 2539 ("The liberty interest protected in Wolff had its roots in state law"). Since Helms was decided, several circuits have concluded that restrictive confinement imposed for disciplinary purposes impairs a liberty interest only if that interest is substantively protected by state law. Lucas v. Hodges, 730 F.2d 1493 (D.C.Cir.1984); Parenti v. Ponte, 727 F.2d 21 (1st Cir.1984); Dudley v. Stewart, 724 F.2d 1493 (11th Cir.1984); McCrae v. Hankins, 720 F.2d 863 (5th Cir.1983).
 
 
 11
 When restrictive confinement within a prison is expressly imposed as a disciplinary sanction, for example, as a punishment ordered by an Adjustment Committee or a Superintendent's Proceeding in New York after a finding of misconduct, there will ordinarily be no doubt that the confinement impaired a liberty interest protected by state law and that the due process procedures specified in Wolff are therefore required.[2] The state statutes and regulations authorizing restrictive confinement as punishment upon a finding of a disciplinary infraction will invariably provide sufficient limitation on the discretion of prison officials to create a liberty interest. See, e.g. N.Y.Correc.L. Sec. 138(3), (5) (McKinney 1983-84 Supp.); 7 N.Y.C.R.R. Sec. 250 et seq. (1982). However, the existence of a liberty interest grounded in state law is less easy to identify when, as in Sher's case, the prison officials purport to impose restrictive confinement for administrative reasons and the inmate alleges that their true motivation is punishment. The problem is further complicated by the fact that the conditions of confinement in the Reclassification Unit to which Sher was assigned are substantially as rigorous as those prevailing in the Special Housing Units used to house inmates formally disciplined.
 
 
 12
 In such circumstances, we conclude that the appropriate analysis derives from the Supreme Court's decision in both Hewitt v. Helms, supra, and Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Following Helms, we first inquire whether New York statutes or regulations have placed substantive limitations on the discretion of prison officials to place an inmate in a Reclassification Unit for "nonpunitive reasons," Hewitt v. Helms, supra, 103 S.Ct. at 870. The governing statute commits to the unfettered discretion of the State Department of Correctional Services the decision regarding classification of inmates, N.Y.Correc.L. Secs. 134, 135 (McKinney 1968) (repealed and replaced by N.Y.Correc.L. Sec. 137(1) (McKinney 1983-84 Supp.)). The pertinent regulation grants prison officials unlimited discretion to select inmates for evaluation or reclassification and to determine whether for such purposes they may be assigned to restrictive housing units. See 7 N.Y.C.R.R. Secs. 300.3(5), 304.1(a)(4), 304.2(a) (1982). There is not even the mild degree of limitation on discretion that the Supreme Court found Pennsylvania had imposed upon placement in administrative segregation in Hewitt v. Helms, supra, 103 S.Ct. at 871. Therefore, to the extent that Sher's confinement in the Reclassification Unit at Attica was based on administrative concerns, no liberty interest was implicated.
 
 
 13
 The remaining question is whether the liberty interest that would have been implicated had Sher been placed in restrictive confinement as punishment arises in the circumstances of this case. Since the due process issue was decided on motion for summary judgment and no finding was made that a punitive purpose played no part in the confinement decision, the issue becomes one of dual motivation. For purposes of this appeal we may view the case as one in which prison officials had administrative reasons for transferring Sher out of Auburn and into the Reclassification Unit at Attica and may well have also felt that the resulting conditions of restrictive confinement would serve as a form of punishment. Mt. Healthy teaches that state action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis.[3] Normally, determination of that issue of hypothetical causation requires fact-finding. But in some cases the undisputed facts may demonstrate that the challenged action would have been taken on the valid basis alone, and such a conclusion will frequently be readily drawn in the context of prison administration where we have been cautioned to recognize that "prison officials have broad administrative and discretionary authority over the institutions they manage." Hewitt v. Helms, supra, 103 S.Ct. at 869. In this case, there can be no doubt that the administrative reasons relied on by the defendants would have caused them to transfer Sher and confine him in the Reclassification Unit, whether or not they also entertained thoughts of imposing some form of discipline. The information reported to the prison officials, whether or not true, fully justified their decision to remove Sher from Auburn where his contact with inmates who believed, whether rightly or wrongly, that he had bilked them of their money posed a substantial threat to his security and that of the prison. Having decided to transfer Sher to Attica, prison officials would inevitably decide to evaluate and classify him in order to determine his future place of incarceration and to select appropriate programs at that location. Since the administrative, non-punitive basis alone would so clearly have caused Sher's restrictive confinement in the Reclassification Unit at Attica, and since the state officials retained unfettered discretion to assign him there for non-punitive reasons, their action did not impair any protected liberty interest. The absence of procedural due process therefore did not deny Sher any constitutional right to which he was entitled. Judgment for defendants was properly entered because no violation of constitutional rights occurred. It is therefore unnecessary to consider whether the defense of qualified immunity was properly upheld.
 
 
 14
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 That retransfer was ordered because the Court apprehended that the initial transfer violated Fed.R.App.P. 23(a). At the time of the transfer, Sher's appeal to this Court from the denial of a habeas corpus application was pending. See Sher v. Stoughton, 666 F.2d 791 (2d Cir.1981). However, this Court's subsequent decision in Moorish Science Temple of America, Inc. v. Smith, 693 F.2d 987, 988 n. 2 (2d Cir.1982), made clear that a transfer pending adjudication of a habeas corpus appeal does not violate Rule 23(a) so long as the inmate is not removed from the jurisdiction of the reviewing court
 
 
 [2]
 At least this is so when the possible sanctions are of a gravity that includes restrictive confinement for up to fourteen days. See McCann v. Coughlin, supra, 698 F.2d at 121
 
 
 [3]
 Mt. Healthy is not precisely analogous because in that case the state action would have been entirely impermissible if the improper motive was a "but for" cause, whereas in this case, if restrictive confinement would not have been imposed solely for administrative reasons, the state action would not be prohibited but only subject to observance of procedural due process